Filed 10/4/22  P. v. Pena-Catalan CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ABEL THOMAS PENA-CATALAN,<br><br>        Defendant and Appellant. | A157639<br><br>(Contra Costa County<br>Super. Ct. No. 51805712) |

Appellant Abel Thomas Pena-Catalan appeals a final judgment following a jury trial in which he was convicted of 14 sexual offenses based on acts he committed against Jane Doe 1 and Jane Doe 2, who were both minors at the time of the offenses.  Appellant argues that the trial court erroneously denied his motion under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) after the prosecutor exercised a peremptory challenge against a Hispanic man during voir dire. Appellant further argues that there is insufficient evidence to support the jury's finding of attempted rape as to Jane Doe No. 1.  We find no error and affirm.

# I. BACKGROUND

## A. Procedural History

On April 13, 2018, appellant was charged with the following with respect to Jane Doe 1: attempted forcible rape of a child over 14 years old (Penal Code[1] § 664, 261; counts 1 and 2), forcible oral copulation of a child over 14 years old (§ 288a, subd. (c)(2); count 3), lewd act upon a child of 14 or 15 years of age (§ 288, subd. (c)(1); counts 4–6), lewd act upon a child under 14 years old (§ 288, subd. (c); counts 7–9). With respect to Jane Doe 2, appellant was charged with forcible lewd act upon a child under 14 years old (§ 288, subd. (b)(1); counts 10–13) and lewd act upon a child of 14 or 15 years of age (§ 288, subd. (c)(1); count 14). Counts 3 and 7 to 13 were enhanced with a special allegation that appellant committed the acts against more than one victim. (§ 667.61, subds. (b), (e).)

On April 15, 2019, the jury convicted appellant of all charges and found the special allegation of multiple victims true. On June 14, 2019, the trial court sentenced appellant to consecutive terms of 15 years to life imprisonment on counts 3 and 7 to 13. Concurrent terms were imposed on the remaining counts. Appellant's total term of imprisonment was 120 years to life.

## B. Factual History

Our summary of the facts focuses mainly on appellant's history with Jane Doe 1. We do not discuss appellant's lengthy history with Jane Doe 2 which occurred during this same time period since there are no issues pertaining to Jane Doe 2 raised on appeal.

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

Jane Doe 1 was born in January 2001. Appellant, who was born in 1968, was the boyfriend of Jane Doe 1's mother. When Jane Doe 1 was 11 or 12 years old, she, her mother, and her two brothers moved into a house in Hayward with appellant. When Jane Doe 1 was in the seventh grade (13 to 14 years old), they moved into a bigger house in Pittsburg.

At trial, Jane Doe 1 recalled an incident when she was in the fifth or sixth grade where she was sleeping in her mother's bed while her mother was in the shower. She awoke to find appellant touching and grabbing her side. Jane Doe 1 recalled telling the Children's Interview Center afterwards that appellant also touched her vagina over her clothing during this incident. Jane Doe 1 was in shock and did not know what to do. While in Hayward, Jane Doe 1 would at times be left home alone with appellant while her mother went to work. Jane Doe 1 recalled over 10 incidents where appellant came into her mother's bedroom while she was lying on the bed and touched her vagina, butt, and breasts. Jane Doe 1 did not tell her mother about these incidents because she was scared and did not know if her mother would believe her. Appellant also told Jane Doe 1 that something would happen to her if she told her mother.

When Jane Doe 1 and her family moved to Pittsburg, appellant's adopted son, Eduardo, also moved in with them. Although Eduardo eventually moved out, he and Jane Doe 1 became friends and would sometimes talk on the phone. Jane Doe 1's older sister, Michelle, moved into the house with her family after Eduardo moved out. Appellant continued to touch Jane Doe 1 when no one was around. At one time, appellant tried to pull Jane Doe 1 into the downstairs bedroom when the two of them were in the living room alone. Michelle came downstairs and saw this occur. When

3

Michelle asked whether appellant was touching her, Jane Doe 1 lied and said no because she was scared.

Appellant tried to have sex with Jane Doe 1 "multiple times." During one of these times, appellant was on top of her while she was on her mother's bed. Appellant pulled Jane Doe 1's pants halfway down. She told him to stop and tried to pull her pants back up. Jane Doe 1 recalled that she felt like throwing up. She closed her legs tight as appellant tried to break them apart. Jane Doe 1 believed appellant was trying to have sex with her. Jane Doe 1 ran out of the room before appellant was able to take her underwear off. During this and other times appellant tried to have sex with her, Jane Doe 1 felt his penis rubbing over her vagina and tried to stop him from penetrating her by keeping her legs tight together.

Around 2015, when appellant lived in Pittsburg, he at times went to live with Jane Doe 2 and her mother in San Lorenzo. Jane Doe 1 and her family did not know about Jane Doe 2 or her family. Eduardo knew about both families and at one point moved in with appellant and Jane Doe 2's family in San Lorenzo. About two months prior to appellant's arrest in this case, Jane Doe 2 told Eduardo that appellant was molesting her. Then, several days before appellant's arrest, Jane Doe 1 told Eduardo that appellant had been touching her. Jane Doe 1 was crying and sobbing when she told Eduardo. Eduardo told Jane Doe 1 that another girl around the same age as Jane Doe 1 also accused appellant of touching her. Jane Doe 1 learned at this time that appellant had another family and was shocked.

## II. <u>DISCUSSION</u>

### A. *Batson/Wheeler* Motion

Appellant argues that the trial court wrongfully denied his *Batson/Wheeler* motion because the prosecution's reasons for exercising a

peremptory challenge against a potential juror who was Hispanic were racially motivated. We disagree.

1. *Relevant Background*

Juror No. 131 was initially questioned by the trial court during voir dire. The trial court asked Juror No. 131 whether, as a Spanish speaker, he would be able to accept the translation provided by the court if certain witnesses testified in Spanish. He confirmed he would be able to follow the court's instruction. Juror No. 131 also confirmed that, despite some health issues, he could fulfill his duties as a juror and be fair to both sides.

During the prosecutor's questioning of Juror No. 131, she asked him whether he had any children. Juror No. 131 responded, "No, they all old already. Everybody's married." The prosecutor then followed up, "But do you have children?" Juror No. 131 responded, "No, no more. No. I have family, but they already no children." The prosecutor followed up again and asked, "Right. But have you ever had children?" Juror No. 131 responded, "Family, yes. But they already married." The prosecutor then finally confirmed that Juror No. 131 had five (adult) children.

During defense counsel's questioning of Juror No. 131, she posed the following hypothetical: "If you were selected as a juror, and, still, it's Friday, 4:30, 11 people are going one way, you, on the other hand, have heard the evidence, you think entirely different. What would you do in that scenario?" Juror No. 131 responded: "Well, I have to -- it's -- something maybe a little confusing is that, if one child testimony, they are teenager, it's a big difference, because one child, small child, can be manipulated by an adult, say something, whatever they want. The only thing may be confused. Because it's – the way I understand, it's only one person accuse him over here. So only one, a child, or a teenager, whatever it is."

5

At this point, the trial court interjected and told Juror No. 131 that in a criminal trial, all 12 jurors must agree in order to reach a verdict. The court then attempted to explain what defense counsel was trying to ask and stated, "let's say, you heard the whole case, you've heard the evidence, you received my instructions, and you're back deliberating with the other jurors in private, talking about the case, trying to reach a verdict, if you can. And you've been deliberating for days. And it's a Friday, and at 4:00 p.m., 11 jurors – because we have a total of 12; right? 11 jurors have one view of the evidence, and you have a different view. Do you understand where we are now?" Juror No. 131 replied, "Yes, sir." Defense counsel then asked Juror No. 131 again what he would do, and he responded, "Not guilty."

The prosecutor exercised a peremptory challenge against Juror No. 131. Defense counsel brought a *Batson/Wheeler* motion and argued that this challenge was racially motivated since appellant and Juror No. 131 were both Latino men and there were no other Latino men or women currently on the panel. In arguing that a prima facie case had not been made, the prosecutor pointed out that there was another Spanish speaking juror on the panel. After the trial court noted that this juror was not yet in the box, the prosecutor responded that she might have "put him in there prematurely" since he was about to be in the box.[2]

---

[2] Respondent argues that based on the manner in which voir dire was conducted, the prosecutor knew that another Hispanic juror (Juror No. 136) would replace Juror No. 131. Appellant does not challenge this contention. Juror No. 136 did in fact replace Juror No. 131 and was one of the 12 sitting jurors. Respondent argues this provides additional support that the prosecutor's reasons for challenging Juror No. 131 were not racially motivated. We do not discuss this argument further as the trial court did not mention it as a reason for denying the motion.

The prosecutor explained that her reasons for excusing Juror No. 131 were based on "a genuine concern for his ability to understand the proceedings that were taking place." The prosecutor then discussed, as examples, Juror No. 131's answer to the question of whether he had any children, as well as his non-responsive answer of "not guilty" when asked what he would do if he was the one holdout juror during deliberations. Defense counsel responded that she thought Juror No. 131 understood the question after the court re-asked it and explained the circumstances in more detail.

In denying the motion, the trial court held that the defense had not made a prima facie showing that the challenge was made based on race, but nevertheless ruled that the prosecutor's stated reasons for exercising a challenge were race neutral and credible. The court stated that the reasons were "amply supported by the evidence in the record, which was the confusion that the juror expressed at numerous junctures throughout his questioning, and his off-point response to [defense counsel's] question regarding, essentially, issue of unanimity and whether he would hold to his own views." The court went on to state that "[t]he response of not guilty was nonresponsive to the question, because the question in the hypothetical posed did not suggest that the 11 jurors were for guilty."

The trial court further held that the prosecutor's "interpretation of the prospective juror's difficulty in understanding her question regarding children is borne out by the record. She did ask him numerous times. The juror seems to be thinking that [the prosecutor] was asking whether he had young children. That was not her question. It took at least three attempts to get the correct answer." The trial court found the prosecutor's justification credible and supported by the evidence.

### 2. *Law and Standard of Review*

The state and federal constitutions forbid prosecutors from exercising peremptory challenges to remove potential jurors on the account of race, ethnicity, gender, or membership in a similar cognizable class. (*Batson, supra,* 476 U.S. at p. 89; *Wheeler, supra,* 22 Cal.3d at pp. 276–277; *People v. Lenix* (2008) 44 Cal.4th 602, 612 (*Lenix*).)

If a defendant suspects that a potential juror is being challenged for a discriminatory reason, he or she must bring a motion under *Batson/Wheeler*, and the trial court will analyze the motion under the well-established three-step inquiry. "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race [or another impermissible ground]. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination." (*Lenix, supra*, 44 Cal.4th at p. 612.) "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*Id*. at pp. 612–613.)

Our review of the trial court's denial of a *Batson/Wheeler* motion is deferential, and we examine "only whether substantial evidence supports its conclusions." (*Lenix, supra,* 44 Cal.4th at p. 613.) "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." (*People v. Burgener* (2003) 29 Cal.4th 833, 864.)

### 3. *Substantial Evidence Supports the Trial Court's Denial of Appellant's Batson/Wheeler Motion*

Appellant argues the trial court erred in ruling that a prima facie showing had not been made and that the prosecutor's reasons for challenging Juror No. 131 were race neutral. Since the trial court made a ruling under the third stage of the *Batson/Wheeler* inquiry, we skip directly to this stage "to examine whether the trial court properly credited the prosecutor's reasons for the challenges." (*People v. Miles* (2020) 9 Cal.5th 513, 539.)

The prosecutor stated that her reasons for challenging Juror No. 131 were due to "a genuine concern for his ability to understand the proceedings that were taking place." She then provided two examples of where Juror No. 131's answers were non-responsive to the questions asked of him during voir dire. The prosecutor therefore carried her burden in showing that the challenge was exercised for a race-neutral reason under the second stage of the *Batson/Wheeler* inquiry. Indeed, a prosecutor's reason "need not support a challenge for cause, and even a 'trivial' reason, if genuine and neutral, will suffice." (*People v. Arias* (1996) 13 Cal.4th 92, 136.)

Under the third stage of the *Batson/Wheeler* inquiry, the trial court made a sincere and reasoned effort to evaluate the prosecutor's race-neutral justification, and substantial evidence supports the court's denial of the motion. Evaluation under the third stage rests within the exclusive province of the trial court and involves a determination of the prosecutor's credibility and demeanor, including whether such demeanor belies a discriminatory intent. (*Lenix, supra*, 44 Cal.4th at p. 614.) Here, the trial court found the prosecutor's race-neutral reasons to be credible and amply supported by the record. We give deference to this ruling as the trial court was able to

observe the prosecutor's demeanor as well as Juror No. 131's answers first-hand.

In denying the motion, the trial court noted that it took three attempts before Juror No. 131 answered the prosecutor's relatively simple question of whether he had any children. The court also noted that Juror No. 131's answer of "not guilty" was not responsive to defense counsel's question, as "the question in the hypothetical posed did not suggest that the 11 jurors were for guilty." Appellant disagrees and argues that Juror No. 131's responses were reasonable in light of how the questions were phrased. That appellant interprets Juror No. 131's responses to be reasonable does not negate the fact that the prosecutor had genuine, race-neutral reasons for excusing this juror.

Lastly, appellant argues that with respect to the holdout juror hypothetical, Juror No. 131 was never asked whether he would be able to "stand his ground" or "assert his own beliefs" if he was the lone holdout juror. The intent of the question, appellant argues, "was never clearly communicated to [Juror No. 131]." Although Juror No. 131 was not directly asked whether he would be able to stand his ground, nothing in the hypothetical suggested that the other 11 jurors were voting to convict, so Juror No. 131's response of "not guilty" was still nonresponsive and reasonably raised concern for the prosecutor. Moreover, appellant takes issue with the wording of the hypothetical, but it was his counsel who posed this hypothetical to not only Juror No. 131, but numerous other prospective jurors who answered that they would stand their ground or hold onto their beliefs. This supports that the question was not confusingly phrased.

B. Sufficiency of Evidence

Appellant next argues that there is insufficient evidence to support the jury's finding of attempted rape as to Jane Doe No. 1. We disagree.

1. *Standard of Review*

The standard for reviewing a claim for sufficiency of the evidence is well established. "[W]e must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Davis* (1995) 10 Cal.4th 463, 509.)

In reviewing the record, we "resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403.) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*Ibid.*)

2. *Elements of Attempted Rape*

"The crime of attempted rape has two elements: (1) the specific intent to commit the crime of rape and (2) a direct, although ineffectual act towards its commission." (*People v. Clark* (2011) 52 Cal.4th 856, 948 (*Clark*).) Intent to commit rape requires "(1) the intent to commit the act of sexual intercourse; (2) against the will of the victim [citation]; (3) by any of the

means described in section 261, subdivision (a)(2)." (*People v. Lee* (2011) 51 Cal.4th 620, 633.)  This includes "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."  (§ 261, subd. (a)(2).)  Such intent "may be inferred from the facts and circumstances shown by the evidence." (*Clark, supra,* 52 Cal.4th at p. 948.)

With respect to the second element, "the evidence must establish that the defendant's activities went 'beyond mere preparation' and that they show the defendant was 'putting his or her plan into action.' " (*Clark, supra,* 52 Cal.4th at p. 948.)  In other words, "[t]he act must be a direct movement beyond preparation that would have accomplished the crime of rape if not frustrated by extraneous circumstances.  [Citation.]  An actual element of the offense however, need not be proven." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111, overruled in part on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

### 3. *Substantial Evidence Supports the Jury's Finding of Attempted Rape as to Jane Doe 1*

Appellant first argues that there is insufficient evidence to support the second element of attempted rape.  Appellant concedes the evidence shows that he repeatedly molested Jane Doe 1 by touching her breasts, butt, and vagina, but argues that this does not show he attempted to rape Jane Doe 1.  Appellant then argues that his other conduct, including saying "come on, come on" to Jane Doe 1 and on at least one occasion pulling her pants down and attempting to break her legs apart, were but "mere preparation" to commit rape and not an attempt to commit rape itself.

We strain to find any merit in this argument.  Jane Doe 1 testified that appellant tried to have sex with her "multiple times."  During one of these

12

times, appellant was on top of her on her mother's bed and pulled her pants halfway down as Jane Doe 1 tried to pull them back up while telling appellant to stop. Though Jane Doe 1's underwear was still on, she felt appellant's penis rubbing over her vagina and she closed her legs tight as he tried to break them apart. The jury was instructed, with respect to the second element of attempted rape, that a direct step means "a direct movement towards the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion, so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt."

What appellant essentially argues is that because he was unsuccessful in pulling Jane Doe 1's pants all the way down or was unable to take her underwear off due to her resistance, any acts on his part should only be seen as preparation and not a direct step towards committing rape. We reject such an argument, as a finding of attempt is not and should not be dependent on how well or poorly a victim can resist. We find there is substantial evidence that appellant moved beyond "mere preparation" and took actions in an attempt to forcibly have sexual intercourse with Jane Doe 1 against her will. The evidence supports that he put his plan in motion by climbing on top of Jane Doe 1, pulling down her pants, and trying to break her legs apart. Had Jane Doe 1 not resisted as she did by pulling her pants up, keeping her legs together tight, and ultimately running out of the room, it is reasonable to presume that appellant would have accomplished the crime of rape.

Appellant next argues that there is insufficient evidence to support the first element of intent because much of the evidence was based only on Jane Doe 1's perception that appellant was trying to have sex with her. He

13

contends that the evidence at most shows he intended to commit lewd acts, not rape. First, this argument is belied by appellant's own earlier argument that his statement "come on, come on" to Jane Doe 1 "arguably shows a desire to have sexual intercourse with her."

Second, the finding of intent is not merely supported by Jane Doe 1's belief that appellant was trying to have sex with her, but could also be inferred by the facts and circumstances as shown in the record. (See *Clark, supra,* 52 Cal.4th at p. 948.) As we already discussed, appellant tried to pull Jane Doe 1's pants down and break her legs apart while they were in her mother's bedroom, despite her protests. At another point, appellant told Jane Doe 1, "Come on you're gonna do it anyways with someone else" and "I'm gonna teach you." This is substantial evidence to support intent.

## III. <u>DISPOSITION</u>

The judgment is affirmed.

_____

WISEMAN, J.*

We concur.

_____

JACKSON, P. J.

_____

SIMONS, J.

*People v. Pena-Catalan* / A157639

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15